|1ANDRIEU, Judge.
On November 18, 1993, appellant James May was indicted for the second degree murder of Michael Ranson. He was arraigned on November 22 and pleaded not guilty. On February 23, 1994, a twelve-member jury found him guilty as charged. His motion for new trial was filed and denied on April 11, 1994; on that date, he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, May raises two assignments of error. We affirm.
Just before midnight on October 3, 1993, Michael Ranson was shot to death at the corner of St. Claude Avenue and France Street. The bullet entered his face just below his right eye and hit his spinal cord. The trajectory of the wound was toward Ranson’s back in a slightly downward path. Traces of gunpowder found on his face indicated that the shot had been fired within two and one half feet of his face.
The evidence adduced at trial showed that Michael Ranson lived in an upstairs apartment at 1107 France Street, the scene of the shooting. This building included a bar and restaurant on the ground floor and apartments on |2the upper floor. However, the bar and restaurant had permanently closed and Ranson was the only occupant of the building. Ranson’s father, Otis Ranson, lived across the street from his son at 1114 France Street.
At approximately 11:30 p.m. on October 3, 1993, Ronald Virgil, who lived in the same apartment building as Otis Ranson, stepped outside to smoke a cigarette on the sidewalk and was approached by a neighbor, John Summers. After giving Summers a cigarette, he watched as Summers walked toward the corner of St. Claude Avenue and France Street and stopped to talk to Ranson and *830 Nancy Handel. Virgil then watched James May approach the group and grab, hug, and kiss Handel. Handel broke away and May began to cross the street. Virgil heard Ran-son state, “If you are going to shoot me, shoot me.” In response, May turned and stated, “You don’t think I’ll do it? I’ll show you.” Pulling a gun from his pants, May shot Ranson and ran down St. Claude Avenue towards Nicholls High School. Virgil asserted that Ranson did not get up or make any threatening gestures before the shooting.
After the shooting, Virgil went to Otis Ranson’s apartment to tell him that his son had been shot, returned to the scene of the shooting, and waited for the police to arrive. Virgil viewed a photographic lineup twice, once briefly at his home, where he made no identification, and later before the grand jury, where he chose May’s photograph and positively identified May.
John Summers, another resident of the neighborhood, was on his way to a convenience store at the time of the shooting. After getting a cigarette from Virgil, he continued to the corner where Ranson was sitting and talking to a woman subsequently identified as Nancy Handel. Summers saw May approach the group and hug Handel. After an exchange of words between Ranson and May, Summers heard Ranson say, “If you are going to shoot me, shoot me” and saw May shoot Ranson and run down St. Claude Avenue. Summers also ^asserted that Ranson was sitting down at the time of the shooting and did not make any movements toward May prior to the shooting. Summers spoke with police officers on the night of the shooting, and “a couple of nights after” the shooting, he and Virgil went to police headquarters to give statements.[1] While being interviewed, he viewed a photographic lineup and identified May as the man who shot Ranson. Virgil was not present when Summers viewed the lineup.
New Orleans Police Department Detective Norbert Zenon interviewed Summers, Virgil, and Nancy Handel and conducted separate photographic lineups with them. Although Virgil did not make an identification when shown the lineup at his house, he identified May when shown the photographic lineup while testifying before the grand jury. Each of them chose May’s photograph from the lineup and seemed sure of their selection even though only Handel knew May by name.

ASSIGNMENT OF ERROR NO. 1

May asserts that the prosecutor went beyond the permissible scope of an opening statement, making inflammatory statements so prejudicial as to deprive him of his right to a fair trial. He contends that the trial court erred in denying his motion for mistrial. However, no motion for a mistrial appears in the record and, accordingly, he may not complain on appeal that one was not granted. State v. Greer, 553 So.2d 892, 894 (La.App. 4 Cir.1989).
In any event, these statements do not mandate reversal. Article 766 of the Louisiana Code of Criminal Procedure provides: “The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the 14charge.” The statements of which May complains concerned the value of a human life and the victim’s value to his family. In his brief, May states that he objected five times; however, the record shows only three contemporaneous objections to the State’s opening statement. These three objections were all overruled. They occurred as follows:
MR. DEARING [the prosecutor]:
Ladies and gentlemen, how much is a human life worth? When I was growing up—
MR. LINDER [the defense counsel]:
Objection, your Honor, that’s argument. I believe he’s supposed to go into the facts of the case.
THE COURT:
I’m going to overrule that.
MR. LINDER:
Note my objection for the record.
*831 MR. DEARING:
As a child growing up my father often used to tell me that he wouldn’t trade me for any amount of money in the world. I think he did that to make me feel special, and I kind of hope that he meant it, too.
How much is a human life worth? If you ask Otis Ranson how much his son, Michael, was worth to him, I’m sure he couldn’t place a value on his son’s life.
MR. LINDER [the defense attorney]:
Objection, your Honor, he’s arguing his case. He is not stating what evidence he intends to prove the case by.
THE COURT:
By way of introduction, each side has a right to go into some introductory material prior to going into the facts and the law that they feel are ^relevant in this case. I will overrule your objection, and I will note it for the record.
[[Image here]]
MR. DEARING:
And he was a private person. He kept to himself. Like I said, he wasn’t a fire fighter; he didn’t have a medal on his chest. But to a lot of people he was an important person.
MR. LINDER:
Your Honor, I have to respectfully object again. I believe the State’s opening is appealing to sympathy, and it’s impermissible [sic] to do it at this stage of the trial and it’s inpermissible [sic] to appeal to the prejudices and sympathy of the jury during any stage of the trial.
THE COURT:
I’ll overrule that objection.
A trial court’s rulings concerning the scope of an opening statement should not be disturbed absent a manifest abuse of discretion. State v. Deboue, 496 So.2d 394, 403 (La.App. 4 Cir.1986), writ denied, 501 So.2d 229 (La.1987). The Deboue court set forth the standard for ascertaining manifest abuse of discretion:
If the appellate court finds that the prosecutor’s argument contained improper remarks, a reversal is warranted only if the court is thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. [Citation omitted.] Credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence. [Citations omitted.]
Deboue, 496 So.2d at 403.
The prosecutor stated that a value cannot be placed on a person’s life and that Ranson was important to his friends and family. May contends that in making these statements, the prosecutor exceeded the permissible scope of Ran opening statement. However, as the trial court noted, both the state and the defense traditionally have some latitude in presenting introductory material. May further argues that the prosecutor’s remarks were inflammatory. The state counters that these comments were appropriate in view of the facts that Ranson was unemployed and was living in an abandoned building; there was also a stipulation that traces of both recent and long-term cocaine use were present in Ranson’s system at the time of his death. Even if we were to find that the State’s remarks were beyond the scope of an opening statement, we would not reverse because it appears improbable that these remarks contributed to the jury’s verdict. ;
The cases May relies upon do not compel the coinclusion that the prosecutor’s statements deprived him of a fair trial. In State v. Carter, 572 So.2d 1131, 1135 (La.App. 1 Cir.1990), the court found that even if the prosecutor’s three references during the opening statement to the crime as “gruesome” were assumed to be improper, and even if the defense had objected to them or requested an admonition or mistrial, admission of the remarks would not be reversible error because the defense was able to counter any prejudice during its opening statement. In State v. Crocker, 551 So.2d 707 (La.App. 1 Cir.1989), the prosecutor introduced his case by commenting on the effects of drug trafficking on the state and by saying that defense counsel would choke on the facts of the case. The court found that although these remarks went beyond the scope of the opening statement, the trial judge acted properly in overruling the two defense objec *832 tions and directing the prosecutor to confine himself to the evidence the state would produce.
Deboue concerned a robbery during which a six-year-old girl and a twelve-year-old boy were murdered. During the State’s opening statement, the prosecutor said the defendants knew that “dead children can never tell what ^happened.” The court found that the trial court properly sustained the defendant’s objection and admonished the jury to disregard the prosecutor’s remarks; however, the court went on to note that a mistrial is a drastic remedy and found that the trial court did not err in denying the defendants’ motion for mistrial. Deboue, 496 So.2d at 403.
In State v. White, 244 La. 585, 153 So.2d 401, 406 (La.1963), the Louisiana Supreme Court found the trial judge erred in not sustaining defense objections to remarks in the prosecutor’s opening statement that belittled the defendant and his defense and that informed the jury that the prosecutor knew the defendant was guilty. The defendant’s conviction was reversed on this and other grounds. In the instant case, the prosecutor did not evaluate the evidence or express his personal belief in May’s guilt during the opening statement. This assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 2

May contends that the trial court erred in denying his motion for new trial because Zenon testified that Handel identified May and because the photographic lineup introduced at trial included the signatures of both Summers, who testified at trial, and of Handel, who did not testify. He also alleges that the trial court erred in allowing Zenon to testify that Handel knew May. He argues that all of this evidence was inadmissible hearsay and that because Handel was so close to the incident, this evidence bolstered the identifications made by Summers and Virgil and contributed to the verdict.
The transcript reveals that May objected to neither the questions concerning Handel’s identification of May nor to the introduction of the lineup with Handel’s signature on the back of May’s photograph. “The contemporaneous objection rule exists, not only so that a trial judge may correct the error at the time it is made, but it also serves notice in the record |8that the complained of conduct was so noticeable as to create prejudice in the minds of the jurors.” State v. Taylor, 91-2496, p. 5 (La.App. 4 Cir. 3/29/94), 635 So.2d 416, 420. On appeal, May can not complain of the admission of evidence to which he did not object at trial.
May did object to Detective Zenon’s testimony that Handel was acquainted with May. During redirect examination of Zenon, the following occurred:
BY MR. DEARING:
Detective, the three witnesses that you’ve addressed in your testimony that identified Mr. May, did any of them know Mr. May?
MR. LINDER:
Objection, your Honor, hearsay.
THE COURT:
Overruled.
MR. LINDER:
How does this detective know what somebody else knows?
THE COURT:
Overruled. Note your objection, please.
[[Image here]]
[BY MR. DEARING:]
Which of the three knew the perpetrator by name?
A. It was Nancy, Nancy Handel.
Q. Was she able to provide any information as to where the perpetrator may live?
MR. LINDER:
Objection, your Honor.
|9THE COURT:
I would sustain that.
May objected to the state’s question because it called for a response based on hearsay. Zenon did not personally know whether any of the witnesses knew May, so his answer was based on out of court statements. His testimony was hearsay and the trial court should have sustained May’s objection.
However, this error does not entitle May to a new trial. The Louisiana Supreme *833 Court recently set forth the harmless error standard for the introduction of erroneously introduced evidence:
The task of a reviewing court conducting a harmless error analysis is to determine whether the error contributed to the verdict or whether “the force of the evidence presumably considered by the jury in accordance with the instructions [of the court] is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the [error].” [Citation omitted.]
State v. Corley, 93-1934, pp. 5-6 (La. 3/11/94), 633 So.2d 151, 154, cert. denied, — U.S. —, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994).
May alleges that Zenon’s testimony that Handel knew May contributed to the verdict. He argues that Virgil’s identification was tentative because Virgil did not choose a photograph the first time he was shown the lineup. Virgil admitted that he made no identification when first shown the lineup at his home, but he testified that when he chose May’s photograph from the lineup while testifying before the grand jury, he was sure of his selection. May alleges Summers was vague when he testified concerning his viewing of the lineup. A reading of Summers’s testimony shows that Summers did not clearly remember the procedures used in signing and initialing lineup photographs; however, he did clearly remember that no other witnesses were with him when | i0he viewed the lineup and that he picked May’s photograph because he recognized May as the man who shot Ranson. May further argues that Virgil and Summers testified inconsistently as to whether the other could see the shooting. However, Virgil and Summers both testified that they personally witnessed the shooting.
The cases upon which May relies to support his contention that the introduction of Zenon’s statement was reversible error are distinguishable. In State v. Veals, 576 So.2d 566 (La.App. 4 Cir.1991), writ denied, 578 So.2d 931 (La.1991), the state had been prohibited from eliciting testimony from a witness that the murder victim had told him on the telephone immediately before the murder that the defendant was at his house. However, the state elicited the information that the witness had seen the defendant earlier that day, that he had spoken by telephone with the victim immediately before the murder, that the victim had told him who was at the house, and that the witness earlier that day had seen the person who the victim said was at his house. The court found that this testimony was an indirect admission of inadmissible hearsay evidence. In further finding that admission of this hearsay was reversible error, the court noted that the evidence was cumulative in the sense that it corroborated the testimony of the defendant’s accomplice to the murder, who had testified that the defendant had killed the victim. However, the accomplice’s credibility had been damaged; the bargain he had made with the state in return for his testimony had been elicited, and seven inmates testified that the accomplice had told them that the defendant had not killed the victim. There was no physical evidence that linked the defendant to the killing, and several alibi witnesses testified for the defendant at trial. The court found that it could not conclude that the inadmissible evidence did not contribute to the verdict.
InSimilarly, reversible error was found in State v. Phillips, 471 So.2d 319 (La.App. 4 Cir.1985). In that case, the defendant’s car was identified as having been used in a purse snatching. The defendant testified that at the time of the crime his car was in the repair shop. However, a police officer testified that he had contacted the repair shop and had been told that the car had been returned to the defendant prior to the date of the crime. The court found that the improperly-admitted hearsay testimony of the police officer had directly contradicted a tenable defense of mistaken identity; the court also observed that the state had presented only one witness and that this witness had seen the defendant and the defendant’s automobile license number “at night under less than optimal conditions.” Phillips, 471 So.2d at 321. The court set aside the defendant’s conviction and ordered a new trial.
In State v. Vessell, 450 So.2d 938 (La.1984), the defendant denied that he had ever been in the murder victim’s apartment. A police officer testified that he had spoken with the *834 victim’s boyfriend, who told him that a particular microphone had been in the victim’s apartment. The officer introduced a sales receipt indicating that the microphone had been sold to the boyfriend. The microphone had been found in the defendant’s house. The Louisiana Supreme Court found that the state failed to lay a proper foundation for introduction of the sales receipt and that introduction of this inadmissible hearsay was reversible error.
Here, the only hearsay evidence to which May objected was Zenon’s statement that Handel knew his name. The jury heard Virgil and Summers testify that they had heard some of the conversation and had personally witnessed the shooting; the independent and unequivocal identifications of Virgil and Summers do not appear to be suspect. Even if Zenon’s statement that Handel was acquainted with May were seen as supporting the | ^identifications made by Virgil and Summers, it seems unlikely that the statement contributed to the verdict. The mass of evidence presumably considered by the jurors would have led them to conclude that May was the man who shot Ranson even if the trial court had not allowed Zenon’s statement. Therefore, the trial court’s admission of this hearsay statement was harmless error and this assignment of error is without merit.
Accordingly, May’s conviction and sentence are affirmed.
AFFIRMED.

. Virgil did not give a statement that night because the time became too late.