Judge Paula A. Brown
This is a criminal appeal. Defendant, Dajuan A. Alridge ("Dajuan") seeks review of his conviction of second degree murder and his sentence of life imprisonment without the benefit of parole. For the reasons *267 set forth below, we affirm Dajuan's conviction and sentence.
PROCEDURAL HISTORY
On March 25, 2010, Dajuan and co-defendant, Dennis Lewis ("Dennis")-two seventeen-year-olds-were indicted by the grand jury for the charge of second degree murder of fifteen-year-old James McKenzie ("James").[2] A jury trial commenced on October 19, 2015, and concluded on October 21, 2015. With an eleven to one vote, the jury convicted Dajuan of second degree murder, a violation of La. R.S. 14:30.1. Prior to sentencing, Dajuan filed motions for new trial and post-verdict judgment of acquittal, which the district court denied. On June 16, 2016, Dajuan was sentenced to life imprisonment at hard labor without the benefit of parole.[3] This appeal followed.
ERRORS PATENT
Pursuant to La.C.Cr.P. art. 920, a review for errors patent on the face of the record reveals no errors.
FACTS
Dennis and James lived in the same neighborhood on Hauck Drive in New Orleans, Louisiana. On the morning of November 30, 2009, Dennis asked James to go with him to an abandoned house in the neighborhood. Dajuan was with Dennis. While at the abandoned house, Dennis held James from behind while Dajuan stabbed James forty-nine times. James was found dead in the abandoned house; and his face was wrapped in duct tape and his body was covered in a sheet of plastic.
During the three days of trial, the following pertinent testimony was elicited:
Lashonda Enclade
Lashonda Enclade ("Ms. Enclade"), James' mother, recalled that on November 30, 2009, she went to work, leaving James at home to babysit his youngest brother, five-year-old K.S.[4] Ms. Enclade lived on Hauck Drive. While at work, she attempted to call James, but she did not reach him. When she returned from work, K.S. told her that James left the house that morning with Dennis and a "boy with dreads." When James did not come home that night or the following day, Ms. Enclade called the police and reported James missing.
Ms. Enclade testified that Dennis had threatened James at knifepoint on Thanksgiving Day, and Dennis accused James of stealing his gun. Ms. Enclade also stated she was aware Dennis recruited someone to help him reclaim his gun. Ms. Enclade made several attempts to speak to Dennis' mother about James' disappearance. On Saturday, December 5, 2009, Ms. Enclade walked to Dennis' house and confronted Dennis' mother. Dennis' mother denied that she and her son knew anything about James' disappearance.
Also, Ms. Enclade, her family, and friends began canvassing the neighborhood on December 5, 2009, with flyers requesting information on James; and the flyer had a picture of James on it. The neighbors began telling the family members information.
*268 Ms. Enclade testified that "[t[he neighbors was [sic] coming out, saying they heard, stuff they seen, Dennis and my son ... and another boy, walking up the street." Another neighbor told Ms. Enclade he smelled smoke coming from the backyard of Dennis' home on Monday, November 30, 2009. Ms. Enclade testified that based on information from the neighbors, her family members entered an abandoned house on the corner and found James' body.
Detective Debra Norman
Detective Debra Norman ("Detective Norman"), employed by the New Orleans Police Department ("NOPD"), testified that she was dispatched on December 5, 2009, to Hauck Drive on a disturbance call. As she arrived on the scene, Detective Norman noticed people posting pictures of a missing person. Detective Norman learned that a neighbor saw Dennis burning clothes in the backyard of his mother's house on November 30, 2009. Detective Norman entered the backyard to investigate the report and discovered a pile of burned clothing on the ground. At the time she made that discovery, she heard screams coming from the abandoned house on the corner of Hauck Drive and Prentiss Street. She relocated to the house and found James' body.
Dennis Lewis
On that same day, December 5, 2009, Dennis was taken to the police station where he was interrogated by Detective Orlando Matthews ("Detective Matthews").[5] During the interrogation, Dennis gave several statements to police including a statement implicating Dajuan as the person who stabbed James.
At trial, Dennis denied killing James and explained he pled guilty because, "[i]f I got a paid lawyer, you [the State] wouldn't be able to use the [Dennis'] statements." Dennis expounded he confessed to the police that he stabbed James to protect his mother from the threat made by the police to put her in jail. When questioned by the State about how he knew details about the crime scene such as where the victim's body was found, and that the body was covered with plastic, Dennis said that Detective Matthews told him. Dennis continued to deny any involvement in the murder and said he never told his mother he stabbed the victim.
Since Dennis denied any involvement in the murder, the State played a portion of a videotaped statement taken during Dennis' interrogation at the police station. This portion of the video depicted Dennis in a room with his mother, and Dennis telling his mother that Dajuan stabbed James. At that time, Detective Matthews had left the room.
Following the playing of the video, Dennis admitted, at trial, that he had stabbed James, but he denied Dajuan was involved. Dennis explained that James stole his gun and that James took it from his "stash spot" in the neighborhood. Dennis admitted the last time he saw James was when they left together from James' house. Dennis recalled he and James went into an abandoned house; he told James they were going to talk about something. When the two entered the abandoned house, Dennis began hitting James and James tried to fight back. Dennis found a knife in the house and began stabbing James. When asked how he stabbed James, Dennis testified that he "just grabbed him and started stabbing." Dennis stated James tried to run, but he held James down. After Dennis stabbed James, he wrapped James' face with duct tape. Dennis testified he left before James died. Dennis stated he *269 burned his and James' clothes in the backyard of his home to get rid of the evidence.
Because Dennis continued to deny any involvement by Dajuan, the State played the entire videotaped statements given by Dennis to police.[6] Notably, in the last statement to Detective Matthews, Dennis stated he went to James' house on the morning of November 30, 2009. He wanted to confront James about stealing his gun. He continued explaining that he and Dajuan lured James to an abandoned house on Hauck Drive to smoke marijuana. According to Dennis, because James continued to deny stealing his gun, Dajuan stabbed James multiple times while Dennis held James from behind. Dennis stated he found a knife in the house, and later, he threw the knife in the river. Dennis wrapped James' face and head in duct tape and covered the body with a sheet of plastic. He and Dajuan returned to Dennis' house where Dennis burned his, Dajuan's, and James' blood-stained clothing and shoes.[7] Dennis gave to Dajuan some of his clothing and a pair of his sister's shoes, which had rainbow shoelaces, for Dajuan to wear home.
After the jury heard the videotaped statements, Dennis retracted his statement that Dajuan stabbed James. He explained he lied about Dajuan stabbing James so his mother would think he was innocent of the murder, and Dennis stated he perjured himself at trial when he testified he did not kill James. Dennis testified he lied when he said he gave Dajuan his sister's shoes to wear home after the murder. Dennis explained he saw Dajuan purchase the women's shoes from Footlocker. When Dajuan was arrested, he was wearing women's tennis shoes similar to the description Dennis gave in his statement. Dennis identified the shoes at trial. When confronted by the State with the fact that two different sized shoe prints were left at the murder scene, Dennis claimed one print belonged to him and the other to the victim.
John Duzac
Former NOPD Detective John Duzac (Mr. Duzac) testified that in 2009 he was assigned to the Crime Task Force with the FBI, and he was dispatched to Hauck Drive on December 5, 2009. Mr. Duzac said that during the course of his investigation, he learned Dennis threatened the victim with a knife on Thanksgiving Day. Additionally, he discovered that a neighbor had seen Dennis burning items in Dennis' backyard.
Mr. Duzac obtained evidence of the burned clothing retrieved from the rear of Dennis' residence on Hauck Drive; the evidence included three socks-one pair of socks and a single sock.
Mr. Duzac identified photographs of the scene. Many of the photographs depicted bloody footprints taken at the scene.[8] Mr. Duzac testified one of the footprints measured 280 millimeters and another footprint measured 245 millimeters. Mr. Duzac estimated one was about a size 10 and the other about a size 7. Mr. Duzac explained the smaller footprint was photographed at the scene of the crime on December 8, 2009. Mr. Duzac recalled, when Dajuan was arrested, he was wearing a pair of tennis shoes. These shoes were introduced into evidence and published to *270 the jury; they were identified as "[o]ne pair of rainbow colored Nike tennis shoes, size 6."[9]
K.S.
K.S., James' brother, was eleven years old and in the sixth grade at the time of trial.[10] K.S. testified the last day he saw James was November 30, 2009, at their home. K.S. stated James left the house with "Dennis" and "the other person with dreads." K.S. recalled being brought to the Child Advocacy Center at Children's Hospital in New Orleans ("Center") and speaking to a person about what happened the morning James disappeared. The interview occurred on December 14, 2009. At the Center, K.S. identified two people from pictures he viewed in separate photographic line-ups. From one photographic lineup, K.S. identified the "boy with dreads," and he acknowledged he circled Dajuan's picture in the line-up with a crayon. From the second photographic lineup, K.S. identified Dennis, and he acknowledged he circled Dennis' picture in the line-up with a crayon.
Daniel Dooley
Daniel Dooley ("Mr. Dooley"), a forensic interviewer at the Center, testified he interviewed K.S. on December 14, 2009.[11] Mr. Dooley testified that K.S. identified, and circled in crayon, one picture from each photographic lineup.
Dr. Samantha Huber
Dr. Samantha Huber, Chief Forensic Pathologist for the New Orleans coroner's office, autopsied the victim's body. Dr. Huber testified the victim bled to death after being stabbed forty-nine times. Most of the wounds were delivered to the victim's chest and abdomen. Those wounds incised the victim's lungs, liver, stomach and heart. She noted that some of the stab wounds were made to his arms and legs, as if the victim was defending himself. She also noted that the back of the victim's body did not exhibit any stab wounds. Dr. Huber testified that the injuries inflicted were not inconsistent with there being two perpetrators with one of the perpetrators holding the victim. Dr. Huber recalled that when she received the victim's body at the morgue, the clothing on the body included green shorts, boxer shorts, white undershirt, and pair of white socks that were blood soaked. Dr. Huber was of the opinion the bottom of the soles of the socks were blood-soaked because James may have stepped in his blood and/or he was standing up when he was stabbed.
Dajuan's jailhouse calls
The jailhouse calls of Dajuan to his family and friends were played for the jury. The pertinent content of the calls included: (1) Dajuan stating that Dennis was one of his best friends, but they had different friends; (2) Dajuan referring to Dennis as his "fall-partner"; and (3) an unnamed person offered to find someone to testify on Dajuan's behalf.
DISCUSSION
Dajuan assigns fourteen errors. These assignments of error have been addressed out-of-order and some, that are interrelated, were combined.
*271 ASSIGNMENT OF ERROR NO. 2: INSUFFICIENT EVIDENCE
Dajuan challenges his conviction asserting the State presented insufficient evidence to support the jury's conviction of second-degree murder, violating Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
"When issues are raised on appeal as to the sufficiency of the evidence, and as to one or more trial errors, the reviewing court must first determine the sufficiency of the evidence." State v. George , 15-1189, p. 9 (La. App. 4 Cir. 11/9/16), 204 So.3d 704, 711 (quoting State v. Marcantel , 00-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55 ). This Court, in State v. Hickman , 15-0817, p. 9 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1165-66 (quoting State v. Brown , 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18 ), set forth the standard for determining a claim of insufficiency of the evidence as follows:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal , [20]00-0674 (La. 6/29/01), 796 So.2d 649, 657 (citing State v. Captville , 448 So.2d 676, 678 (La.1984) ).
"[W]hen circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." State v. Egana , 97-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 228 (citing State v. Shapiro, 431 So.2d 372 (La.1982) ). Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. Shapiro , 431 So.2d at 384 (citations omitted).
Additionally, "[i]f rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted." State v. Green , 588 So.2d 757, 758 (La. App. 4 Cir. 1991) (citation omitted). It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence and credibility determinations; the weight attributed to the evidence is soundly within the province of the fact finder. State v. Scott , 12-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508 (citing State v. Johnson , 619 So.2d 1102, 1109 (La. App. 4 Cir. 1993) and State v. Brumfield , 93-2404 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316 ). Therefore, "[c]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency." State v. Jones , 537 So.2d 1244, 1249 (La. App. 4 Cir. 1989) (citation omitted). Moreover, "[a]bsent internal contradiction or irreconcilable conflict with physical evidence, a single eyewitness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. Marshall , 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369 (citation omitted).
In the case sub judice , the State had the burden to prove (1) the killing of a human being; (2) with specific intent to kill; and (3) that Dajuan was the perpetrator. La. R.S. 14:30.1 ; State v. Scott , 15-0778, p. 10 (La. App. 4 Cir. 6/29/16), 197 So.3d 298, 304-05, writ denied, *272 16-1542 (La. 6/5/17), 219 So.3d 339.[12] Applying the Jackson standard, a trier-of-fact could have found beyond a reasonable doubt that a perpetrator intended to kill James when he stabbed James forty-nine times, and James died as a result; thus, the first two elements, which are uncontested by Dajuan, are met.
Dajuan does, however, assert that the State failed to prove he was the perpetrator. It is well settled that " '[w]here the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof.' " Scott , 15-0778, p. 10, 197 So.3d at 305 (quoting State v. White , 14-0397, pp. 18-19 (La. App. 4 Cir. 7/29/15), 174 So.3d 177, 189 ).
Dajuan contends Dennis alone committed the crime. Dajuan argues that "there is no credible forensic evidence and no competent witnesses" proving he committed the murder.
Alleged inconsistent testimony and statements
Dajuan first asserts Dennis was incompetent, and his testimony and statements were inconsistent:
It was only after Dennis was handcuffed to an interrogation table for four hours, repeatedly told by the police that they did not believe that he committed the crime alone, and that they were going to arrest his mother, that Dennis said Dajuan was involved.... This interrogation, on December 5, 2009, was the last time that Dennis ever claimed that Dajuan was involved in the murder.
* * *
Dennis' testimony was so illogical that no rational trier of fact could have given weight to his prior statements.... The only unequivocal statement Dennis made throughout his testimony was that Dajuan was not involved in this crime. Under either circumstance, Dennis's testimony, the only person present when the victim was murdered, failed to establish beyond a reasonable doubt that Dajuan participated or was present during this crime.
In State in Interest of K.M. , 14-0306 (La. App. 4 Cir. 7/23/14), 146 So.3d 865, the juvenile, K.M., was charged with simple assault against his mother after threatening to stab his mother in the face. At the adjudication hearing, the mother's testimony differed from the statement she gave to police. K.M.'s mother testified that she did not hear her son threaten her, and she did not believe that her son would stab or harm her. Id. 14-0306, p. 1, 146 So.3d at 868. In reviewing the sufficiency of the evidence, this Court considered whether the evidence presented by the state, i.e. the prior inconsistent statement made by the mother to police, was sufficient to sustain the adjudication of K.M. beyond a reasonable doubt. Id. 14-0306, p. 8, 146 So.3d at 871. In affirming the conviction, this Court explained the fact the mother's testimony at trial was inconsistent with her statement given to police was a credibility determination to be made by the trier of fact:
[W]hen conflicting testimony about factual matters exits [sic], the resolution of which depends upon a determination of *273 the relative credibility of the witnesses, the matter is a question of weight of the evidence, not its sufficiency. State v. Jones , 537 So.2d 1244, 1249 (La. App. 4th Cir.1989) ; see also Tibbs v. Florida , 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State in the Interest of T.C. , 09-1669 at p. 6, 60 So.3d [1260,]at 1263 [ (La.App. 4 Cir. 2011) ].
State in Interest of K.M. , 14-0306, p. 10, 146 So.3d at 872-73.
In the case sub judice , the jury accepted Dennis' statement implicating Dajuan and rejected Dennis' recantation.
Corroborating evidence
Dajuan further contends the jury's determination was not supported by the evidence. Dajuan asserts: (1) K.S.'s testimony as unreliable;[13] (2) the footprint evidence was unreliable;[14] (3) Dr. Huber's testimony was "ambiguous" and did not implicate him; and (4) the other witnesses' testimony exclusively linked Dennis to the crime.[15] We disagree.
K.S.'s identification was corroborated by Mr. Dooley and Dennis. Additionally, the jurors were able to consider K.S.'s age and weigh his credibility. Dr. Huber testified that the injuries James sustained were not inconsistent with there being two perpetrators. The jury heard testimony of the burned clothing recovered from Dennis' home, which consisted of three socks-a pair of socks and a single sock, and that James had on both of his socks when Dr. Huber performed the autopsy. The jurors were likewise shown pictures depicting the bloody footprints and heard exhaustive testimony about the two different-sized footprints, one footprint being smaller than the other footprints. Moreover, the women's size 6 tennis shoes, that were worn by Dajuan when he was arrested, matched the description Dennis gave in his statement to police. We find the jury's credibility determination of Dennis' statement implicating *274 Dajuan was not clearly contrary to the evidence presented.
Applying the Jackson standard, viewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found the State negated any reasonable probability of misidentification and proved beyond a reasonable doubt that Dajuan killed James. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 3: INCOMPETENCE OF DENNIS
Dajuan challenges Dennis' testimony on the basis that it was erratic, and Dennis lacked competency. Dajuan argues the district court erred by allowing Dennis to testify considering: (1) he had a documented history of schizophrenia ; (2) he had been institutionalized in a mental facility; (3) he was not taking his prescribed medication at the time of his testimony; and (4) he was found incompetent at least once prior to trial. Additionally, Dajuan contends the district court erred in failing to conduct a competency hearing when the defense requested one during Dennis' testimony. Dajuan asserts because Dennis was a mental patient, the district court was required to hold a competency hearing citing Shuler v. Wainwright , 491 F.2d 1213 (5th Cir. 1974).
In Shuler , a fifty-six year old woman was forced from her home by intruders, beaten, and raped. Id. , 491 F.2d at 1215. Due to the injuries sustained in the attack, she became incompetent, and she was committed to a mental institution. At the time of the trial, she was still in the mental institution. On appeal to the United States Fifth Circuit Court of Appeal, the defendant asserted the state failed to voluntarily furnish the defense with a copy of the victim's statement resulting in a violation of his due process rights.[16] In discussing the assigned error, the court addressed the victim's competency and set forth the applicable law if a witness, such as the victim, testified at trial:
If a patient in a mental institution is offered as a witness, the opposing party has a right to challenge his competency, whereupon it becomes the duty of the Court to make such examination as will satisfy it of the competency or incompetency of the proposed witness.... The findings of the trial court may not be rejected on review except for an abuse of discretion....
Shuler , 491 F.2d at 1223-4 (citations omitted).
We find Shuler inapplicable. Unlike the victim in Shuler , Dennis was not in a mental institution at the time of trial. Additionally, we find the district court did not err in allowing Dennis to testify.
Louisiana Code of Evidence Article 601 provides that "[e]very person of proper understanding is competent to be a witness except as otherwise provided by legislation." Understanding, not age, is the test of whether any person shall be sworn as a witness. State v. Deutor , 02-1869, p. 6 (La. App. 4 Cir. 3/19/03), 842 So.2d 438, 442 (citation omitted). "A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods." Id. Great weight is given to the trial judge's determination of competency because of his or her opportunity to see and hear the witness. Id. 02-1869, pp. 6-7, 842 So.2d at 442.
Dennis was declared incompetent on August 1, 2013, and remanded to a Louisiana mental facility. After several delays, a competency hearing was held on *275 January 9, 2014, and Dennis was found competent to proceed. Another mental competency hearing was held on April 23, 2015, and Dennis was declared competent. On April 24, 2015, Dennis entered a guilty plea to manslaughter, and he was sentenced to forty years at hard labor. Dennis testified at trial in October 2015.
After Dennis was found competent, the record is devoid of any reference or concern as to Dennis' competency. When the defense raised the issue at trial, Dennis insisted he was competent. His competency was supported by his testimony that relayed his understanding of criminal proceedings; Dennis stated that if he hired a private lawyer, the State would not have been able to use his statements. Further, Dennis demonstrated to the district court he understood the difference between truth and falsehoods; Dennis admitted several times he lied about Dajuan killing James, burning Dajuan's shoes, and lending Dajuan his sister's shoes. Accordingly, we find the district court did not err in failing to conduct a competency hearing and by allowing Dennis to testify. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 10: SUGGESTIVE IDENTIFICATION
Dajuan asserts the district court erred in failing to suppress K.S.'s identification of him as one of the perpetrators. Dajuan argues the photographic lineup was unduly suggestive as his picture was one of only two pictures in the photographic lineup in which the subjects were in orange jumpsuits.[17]
A defendant has the burden of showing that (1) an identification was suggestive and (2) the procedure resulted in the likelihood of misidentification. State v. Holmes , 05-1248, p. 6 (La. App. 4 Cir. 5/10/06), 931 So.2d 1157, 1161 (citations omitted). A trial court's ruling on the admissibility of an identification is entitled to great weight and must not be disturbed unless the trial court abused its discretion by so ruling. State v. Dove , 15-0783, p. 26 (La. App. 4 Cir. 5/4/16), 194 So.3d 92, 110, writ denied , 16-1081 (La. 6/29/17), 222 So.3d 48, cert. denied , --- U.S. ----, 138 S.Ct. 1279, 1280, 200 L.Ed.2d 475 (2018).
A "suggestive identification" is one that unduly focuses a witness' attention on a defendant. Id. "Strict identity of physical characteristics among the persons depicted in the photographic array is not required; however, there must be sufficient resemblance to reasonably test the identification." State v. Francois , 13-616, p. 16 (La. App. 5 Cir. 1/31/14), 134 So.3d 42, 53 (citation omitted). This determination is made by examining articulable features of the persons' pictures such as height, weight, build, hair color, facial hair, skin color and complexion, and the shape and size of the nose, eyes, and lips. Id.
In the present case, the six-person photographic color lineup is on a single sheet of paper which contains two rows of three photographs. All of the photographs are the same size and shape and depict the head and upper chest of the subjects against a neutral color background. The subjects are African-American males of roughly the same age, skin tone, facial features, hair-styled in dreadlocks, and sporting light/sparse mustaches. Although Dajuan complains he is depicted in an *276 orange jumpsuit, another man in the lineup has the same orange shirt/jumpsuit with a collar. Of the remaining four men, two are clothed in white t-shirts and the remaining two men are wearing shirts with black collars. Additionally, Dajuan's picture is positioned in the middle of the bottom row, between the picture of the man in an orange shirt/jumpsuit with a collar and the man with a black collar. We conclude Dajuan failed to prove the photographic line-up was unduly suggestive, and a review of the photographic line-up does not suggest a possibility of misidentification by K.S.
Even assuming that the photographic lineup was unduly suggestive, Dajuan failed to show there was a substantial likelihood that K.S. misidentified him. In State v. Shannon , 11-0955, pp. 8-9 (La. App. 4 Cir. 9/19/12), 101 So.3d 67, 73, this Court set forth the applicable law when addressing a claim concerning an alleged suggestive photographic lineup:
Even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Payne , 04-828, pp. 4-5 (La. App. 5 Cir. 12/14/04), 892 So.2d 51, 53. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite , 432 U.S. 98, 113-14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy , 95-0899, pp. 9-10 (La. App. 4 Cir. 1/31/96), 669 So.2d 517, 523.
In Manson , supra , the Court set forth a five-factor test to determine whether a suggestive identification is reliable, to-wit: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Id. , 432 U.S. at 114-16, 97 S.Ct. 2243, citing Neil v. Biggers , 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In determining the likelihood of misidentification of a suspect, a court must look to the "totality of the circumstances" as informed by the five factors. Neil , 409 U.S. at 199, 93 S.Ct. 375. In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial and at a hearing on the motion to suppress the identification. State v. Lewis , 04-0227, p. 18 (La. App. 4 Cir. 9/29/04), 885 So.2d 641, 652. A trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Offray , 00-0959, p. 5 (La. App. 4 Cir. 9/26/01), 797 So.2d 764, 769, citing State v. Bickham , 404 So.2d 929 (La.1981).
Applying the Manson factors, we find the identification was reliable. K.S. testified Dennis and the "boy with dreads" came to his home, and James left with them. K.S. was home alone with James, when Dennis, who he knew from the neighborhood, and Dajuan, an unknown person, came to the door. K.S.'s description of Dajuan as having "dreads" is consistent with Dajuan's image in the picture K.S. identified from the photographic lineup. K.S. was certain when he circled Dajuan's picture with a crayon and was unequivocal in his identification of Dajuan. K.S. identified Dajuan from the lineup only two weeks after the murder. Finally, K.S. distinguished Dajuan from the other suspect *277 in the photographic lineup who wore an orange shirt/jumpsuit just like Dajuan. Accordingly, we find the district court did abuse its discretion in denying the suppression of K.S.'s identification of Dajuan.
This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NOS. 11 AND 12: VIDEOTAPED STATEMENT
Dajuan complains his Sixth Amendment rights were violated by the State's failure to turn over to the defense, during discovery, the portion of Dennis' videotaped statement in which Dennis told his mother Dajuan stabbed the victim.
Discovery of video
During opening statements, the State disclosed to the jury that they would view and/or hear Dennis' videotaped statement to police. The State pointed out that the videotape contained a segment between Dennis and his mother in which Dennis tells his mother Dajuan stabbed James. The defense objected on the basis it had never received that portion of the videotape depicting this exchange. The district court overruled the objection. The defense suggested that the objection be discussed with the court later, and the judge agreed. The record contains no further objection to the admissibility of videotaped statements on discovery grounds.
The State avers, in its brief, that it turned over the entire videotaped statements given by Dennis to police in a timely manner prior to trial. The State explains the issue was clarified during a bench conference which established that the defense failed to view the video in its entirety. Dajuan responds the bench conference was not recorded; thus, there is no way to determine what happened.
Even assuming the State failed to disclose the portion of the video of Dennis interacting with his mother, the defense was aware of Dennis' statement given to Detective Matthews in which Dennis professed that Dajuan stabbed James. In the opening statement, the defense detailed Dennis' interrogation and pointed out: "When the police comes [sic] back in ....You know what the first thing [Dennis] says ... Dajuan did it with me." Thus, we find this alleged discovery violation, if proven, would be harmless. See State v. Garrick , 03-0137, p. 5 (La. 4/14/04), 870 So.2d 990, 993 (citations omitted) (where the Supreme Court explained that "generally ... discovery violations do not provide grounds for reversal unless they have actually prejudiced the defendant.").
Admissibility of video
Dajuan also challenges the admission of that portion of the video regarding the exchange between Dennis and his mother on the grounds that the State failed to establish its admissibility under La. C.E. art. 613. Louisiana Code of Evidence Article 613 provides, in part, that prior inconsistent statements are "admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so." The proper foundation for the admission of an inconsistent statement " 'requires that the time, place and circumstances in which the statement was made be called to the witness's attention and that the witness be given an opportunity to admit or deny having made the prior statement.' " State v. Pollard , 14-0445, p. 16 (La. App. 4 Cir. 4/15/15), 165 So.3d 289, 301 (quoting State v. Laymon , 97-1520 (La. App. 4 Cir. 3/15/00), 756 So.2d 1160, 1178 ). "The witness's denial of making the prior statement completes the foundation." Id. An evidentiary ruling relating to the admission or exclusion of evidence is reviewed under an abuse-of-discretion standard.
*278 State v. Hampton , 15-1222, p. 7 (La. App. 4 Cir. 12/23/15), 183 So.3d 769, 774 (citations omitted).
We find the record evidence supports that the State complied with Article 613. When the State asked Dennis whether he recalled what he told his mother, after Detective Matthews left the interrogation room, Dennis indicated he did not. The State asked if he wanted to refresh his recollection and Dennis stated, "Yes." Following, the defense lodged an objection. The defense urged that the portion of the video referenced by the State should not be shown to the jury to refresh Dennis' recollection. It appears from the record that only the audio was played for the jury. After Dennis reviewed the exchange between himself and his mother, he expressed it did not refresh his memory. The State moved to have the video admitted into evidence and published to the jury. The defense objected and urged only the exchange between Dennis and his mother should be played. The district court agreed and only that portion of the video was played at that time. We find the district court did not abuse its discretion in admitting that portion of the video.
Dajuan urges even if the video was properly admitted, La. C.E. art. 801(D)(1)(a) requires " 'additional evidence to corroborate the matter asserted by the prior inconsistent statement,' " and the State made "no such showing." As discussed supra , sufficient evidence was presented to corroborate Dennis' statement that Dajuan killed James.
We find this assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 8: IMPROPER COMMENTS BY THE STATE
The defendant complains that during voir dire and in rebuttal to closing arguments, the State improperly commented on his Fifth Amendment right to remain silent.
Comment during voir dire regarding right to remain silent
In the first complained-of commentary by Dajuan, the State stated during voir dire :
[The State]:
Let's say [my co-defendant] swung the bat. We're both equally-we both took swings with the bat. Do you think that makes any difference and I'm willing to testify now. No. Why not? You know why. Everybody in this room probably knows why.
The defense objected to the exchange noting that "[n]o person accused of a crime has to talk...." The district court noted the objection; no motion for mistrial was urged. Following the objection, the State acknowledged a defendant has the right to not give a statement to police:
[The State]:
Nobody has the right to make a statement which is why there is initiative [sic] and nobody is forced to make a statement.... I have the right to say nothing. I have the right to make a statement too....
In State v. Thomas , 553 So.2d 980, 984 (La. App. 4 Cir. 1989) (citing State v. Jackson, 454 So.2d 116 (La.1984) ), this Court explained that "an indirect reference to the defendant's failure to take the stand is reversible only when the prosecutor intended to emphasize it." In State v. Trimble , 589 So.2d 1163, 1164 (La. App. 4 Cir. 1991), the defendant complained that the state, during voir dire , made an impermissible comment on the defendant's election against testifying on his behalf: "The Defendant has the 5th Amendment right against self-incrimination. He has the right not to testify in this proceeding, and the upshot of that is that you cannot hold it *279 against him should he fail to testify." This Court held it did not consider the state's statements to be an intentional reference to the defendant's election not to testify since it was unknown at that point whether he would testify. Id. , 589 So.2d at 1165 (citing Thomas, 553 So.2d at 983 ). Additionally, in State v. Searls , 12-210, p. 3 (La. App. 5 Cir. 12/11/12), 106 So.3d 1146, 1147, the defendant challenged the state's comment during voir dire : "[I]f a witness takes the stand, you can talk about their prior convictions." The Searls court found that the state's remark was an indirect reference to the defendant's failure to take the stand, and explained that the state did not mention the defendant, but referred to "a witness." Id. , 12-210, p. 5, 106 So.3d at 1148. The court found the indirect reference was not intended to focus the jury's attention on the defendant's failure to testify because the trial was in the voir dire stage, and the defendant had not yet elected whether to testify. Id. , 12-210, p. 5, 106 So.3d at 1149.
In the case sub judice , as in Trimble and Searls , we find the complained-of comment by the State was an indirect reference not intended to focus attention on Dajuan's failure to testify. The State was setting forth a hypothetical and did not mention Dajuan's name. Further, at that point in the trial proceedings, whether Dajuan would testify was unclear. Thus, we find this claim lacks merit.
Comment during closing arguments regarding right to remain silent
Dajuan asserts the district court erred in failing to grant a mistrial when the State repeatedly referenced the defense's closing statement, which questioned its decision not to have Dajuan testify at trial. Dajuan argues that "[t]he State claims Dajuan had two options, 'be honest or shut up, cross your fingers and hope for the best' ... This is the sentiment the State repeats at least ten times throughout rebuttal. [footnote omitted]."
Following the State's comment, the defense objected: "Can we put a cap on the number of times [the prosecutor] can comment on [the defendant's] not testifying." The district court overruled the objection, and later, while the jury was deliberating, the district court denied the defense's request for a mistrial.
Louisiana Code of Criminal Procedure Article 770 provides that one of the grounds for a mistrial includes a remark or comment by the district attorney during open or closing argument that refers directly or indirectly to the failure of the defendant to testify in his own defense. In State v. Williams , 16-1192, p. 10 (La. App. 4 Cir. 10/18/17), --- So.3d ----, ---- - ----, 2017 WL 4700384, *19-20, this Court explained an improper argument by the state is subject to the harmless error analysis:
Even where the State exceeds the bounds of proper argument [in closing agruments], a conviction will not be reversed unless the court is thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Dabney , 15-0001 (La. App. 4 Cir. 9/9/15), 176 So.3d 515, 527, writ denied , 15-1852 (La. 10/17/16), 208 So.3d 374. The "reviewing court should accord credit to the good sense and fair-mindedness of the jury that heard the evidence." State v. Henry , 11-1137, p. 15 (La. App. 4 Cir. 10/24/12), 102 So.3d 1016, 1025.
" 'The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.' " Id. (quoting State v. Wessinger , 98-1234, p. 24 (La. 5/28/99), 736 So.2d 162, 183 ).
*280 In the case sub judice , we find the complained-of comments by Dajuan were in response to the comment by the defense in closing arguments regarding the defense counsel's decision not to have Dajuan testify: "I struggle[d] with whether or not to put the [defendant] on that stand ... And I hope I made the right decision by asking him not to. But I don't know if I did." This Court has recognized that "[i]n rebuttal closing argument, the State has the right to answer the arguments of defendant." State v. Baudier , 00-1108, p. 7 (La. App. 4 Cir. 5/23/01), 789 So.2d 696, 703 (citing La.C.Cr.P. art. 774 and State v. Adams , 98-2062 (La.App. 4 Cir. 8/4/99), 752 So.2d 186 ). Thus, we find the district court did abuse its discretion in denying the motion for mistrial on this ground. Further, even assuming the comments by the State were improper, we find any such error harmless based on the evidence presented by the State discussed supra .
Dajuan urges the alleged error is not harmless in light of an affidavit of a juror. The juror's affidavit, which was attached as an exhibit to the motion for new trial, stated that "one of the main reasons the jury decided to convict Dajuan Alridge was due to his failure to testify on his own behalf."
Louisiana Code of Evidence Article 606(B) provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
At the hearing on the motion for new trial, the district court properly found, pursuant to Article 606(B), that "there really is no basis of-in the law that this Court now can support the fact that the Defense has received this affidavit from this juror." We find this claim lacks merit.
Comments during voir dire regarding the burden of proof
Dajuan complains several comments made by the State during voir dire and rebuttal to closing arguments shifted the burden of proof to the defense. The complained-of-comment by the State occurred during an exchange with prospective juror C.C.:
[The State]:
If they put on a case it's just bonus essentially. Then you weigh that evidence and decide what weight to give it, but we have to present the evidence to prove the case. What are your thoughts on that number 26, [C.C.]?
[C.C.]:
Have to weigh both sides and then make a decision.
[The State]:
Now, if they present a case you weigh both sides. If they don't present a case-
[The Defense]:
Objection. They still have the burden of proof even if we present a case.
We find the comment by the State did not shift the burden of proof to Dajuan. The transcript reflects the State followed up *281 with C.C. to make sure the juror understood the principle of law:
[The State]:
If they don't present a case, would that mean he's automatically guilty?
[C.C.]:
Have to look at all the evidence and then make a final decision.
[The State]:
That's exactly right. Even if they don't present a case then you just evaluate the State's evidence and make a final decision.
Additionally, a review of the voir dire transcript indicates the district court advised the prospective jurors that the burden of proof was on the State to prove a defendant's guilt beyond a reasonable doubt. We find this claim lacks merit.
Comments during rebuttal to closing argument regarding burden of proof
Dajuan complains that during rebuttal to closing argument the State mentioned several times the defense's failure to put on any evidence. The State commented that the defense could have called "a crime scene technician to challenge the lead detective's analysis" of the footprint evidence. Additionally, the State commented that the receipt for the shoes Dajuan allegedly bought from Footlocker was not produced.
In State v. Clay , 612 So.2d 266, 270 (La. App. 4 Cir. 1992) (citing State v. Johnson , 541 So.2d 818, 822 (La. 1989) ), this Court held that "[t]he prosecutor, especially in a case where the defense calls no witnesses nor puts on any evidence, may comment on the fact that the prosecution's case is unrebutted." We find the State's comments were a reference to the strength of its case that was unrebutted. Further, at the conclusion to closing arguments, the district court charged the jury. In its instructions to the empaneled jury, the district court reiterated that "[c]losing arguments of the attorneys were not to be considered as evidence." Consequently, we find the district court did not err in overruling Dajuan's objection.
Accordingly, we find this assigned error lacks merit.
ASSIGNMENT OF ERROR NO. 9: PROSECUTORIAL MISCONDUCT
The defendant complains the State committed prosecutorial misconduct by intentionally misleading the jury by defining the term "fall-partner" as someone who would "take the fall" or responsibility for a crime committed by someone else. Specifically, the defense cites to a comment during the State's opening statement:
[The State]:
Dajuan refers ... to Dennis as his fall partner. Some of you may know what that means. Some of you are going to learn throughout the course of this case what that means. He expected Dennis Lewis to take the charge and essentially fall for him.
The defense counsel responded, "Objection, ludicrous, that's not what a fall partner is. [The prosecutor] knows that. Anybody who has worked in criminal defense or in criminal prosecution knows that." The district court overruled the objection.
Louisiana Code of Criminal Procedure Article 766 provides that "[t]he opening statement of the State shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge." The trial judge has wide discretion in controlling the scope and extent of the opening statement." State v. Hughes , 14-487, pp. 22-23 (La. App. 5 Cir. 11/25/14), 165 So.3d 978, 993 (citation omitted). In State v. May , 94-1205, p. 5 (La. App. 4 Cir. 4/26/95), 654 So.2d 829, 831 (citing *282 State v. Deboue, 496 So.2d 394, 403 (La. App. 4 Cir. 1986) ), this Court explained that a trial court's rulings regarding the scope of an opening statement is reviewed under a standard of manifest abuse of discretion.
In the case sub judice , the record evidence reflects that the district court instructed the jury that the arguments and opening statements made by the State and the defense were not evidence. Moreover, Dennis refuted the State's definition of "fall partner," and he testified the term was just another word for co-defendant. Further, given the evidence of Dajuan's guilt discussed supra , we find the State's use of the term "fall partner" was harmless. Thus, we find the district court did not abuse its discretion in overruling the objection.
This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NUMBERS 6 AND 7: BATSON CHALLENGE
Dajuan complains the district court erred on two grounds: (1) it failed to make a proper finding on the defense's Batson challenge by clarifying which step of the Batson analysis it was applying; and (2) alternatively, it failed to find the defense set forth a prima facie cause of discrimination.
In Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the court held that the discriminatory use of peremptory challenges to exclude prospective jurors on account of race is prohibited by the equal protection clause.[18] Recently, in Williams v. Louisiana ("Williams II "), --- U.S. ----, 136 S.Ct. 2156, 195 L.Ed.2d 819 (2016), the United State Supreme Court reiterated the test for a Batson challenge:[19]
"The Constitution forbids striking even a single prospective juror for a discriminatory purpose." Foster v. Chatman , 578 U.S. ----, ----, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016) (internal quotation marks omitted) (citing Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ). Batson provides a three-step process for determining when a strike is discriminatory:
"First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." Foster, 578 U.S. at ----, 136 S.Ct. at 1747 (internal quotation marks omitted; emphasis added).
If the first step of the Batson process-a prima facie showing that a peremptory challenge has been exercised on the basis of race-is not proven, the other steps are not addressed. State v. Williams ( "Williams III ") , 13-0283, p. 17 (La. App. 4 Cir. 9/7/16), 199 So.3d 1222, 1233. Dajuan asserts the district court failed to make a finding as to the first step.
The defense made a Batson challenge at the conclusion of the challenges of the jurors from the first panel:
[The Defense]:
*283 [J]udge, we would like to raise a Batson challenge. The State struck [L. A.], who is a self-identified white female. 1, 2, 3, 4, 5. The other five strikes were all people that I think are self-identified as being African-American, out of 18 potential jurors, all people I think being identified as being African-American. I think that makes out a prima facie challenge, and so the State would have to put on race neutral reasons for why they struck those jurors. The Court can advise-
THE COURT:
I understand. State.
[The State]:
Your Honor, that would not be a prima facie showing, because in fact, Ms. Anderson, as the defense contends, would self-identify as a white female. So, therefore, we have not consistently struck African-American jurors in our peremptory challenges.
THE COURT:
Okay. Objection denied. I note your objection for the record, defense.
Following, voir dire was conducted on the second panel of prospective jurors. No other Batson challenge was urged by the defense.
In support of his claim that the district court erred in failing to rule on whether a prima facie case was made, Dajuan cites State v. Myers , 99-1803 (La. 4/11/00), 761 So.2d 498. In Myers , at the conclusion of the voir dire proceeding, the defendant urged a Batson violation. The trial court did not respond to the objection. The Supreme Court found that "[f]rom the record, it appears the trial judge simply ignored any claim of a Batson violation." Id. , 99-1803, p. 6, 761 So.2d at 502.
In the case sub judice , the district court did not ignore the Batson challenge as the trial court did in Myers. Instead, the district court requested the State to respond to the defense's Batson claim before it made a finding as to whether a prima facie case was shown. After the State's contention that there was no prima facie case of discrimination, the district court denied the objection. Accordingly, we find the record evidence supports the district court's finding that no prima facie showing of discrimination was made. Thus, this claim lacks merit.
Alternatively, Dajuan asserts the district court erred in failing to find the defense set forth a prima facie showing of discrimination. Dajuan points out the State exercised five of its peremptory challenges to remove "every African-American from the first panel of prospective jurors."[20]
A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. Snyder v. Louisiana , 552 U.S. 472, 477, 128 S.Ct. 1203,1207, 170 L.Ed.2d 175 (2008) (citation omitted). In Williams III , this Court set forth three elements that the challenging party must establish to meet step one of a Batson challenge:
(1) the defendant must demonstrate that the prosecutor's challenge was directed at a member of a cognizable group; (2) the defendant must then show the challenge was peremptory rather than for cause; and (3) finally, the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the prospective juror on account of race.
Id. 13-0283, p. 16, 199 So.3d at 1232 (citations omitted). In *284 State v. Duncan , 99-2615, p. 12 (La. 10/16/01), 802 So.2d 533, 544 (quoting Batson , 476 U.S. at 96, 106 S.Ct. 1712 ), the Louisiana Supreme Court explained that a showing of these three steps taken together gives rise to "the necessary inference of purposeful discrimination" by the State. Dajuan has met the first two elements of step one which are undisputed; thus, we address the third element.
The evidentiary hurdle for a defendant under the third element is met by a defendant producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred:
"No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination." State v. Jacobs , 99-0991, pp. 1-2 (La. 5/15/01), 803 So.2d 933, 958 (on reh'g ). Addressing this issue, the Supreme Court in Batson stated that "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " 476 U.S. at 94, 106 S.Ct. at 1712. Providing further guidance on this issue, the Supreme Court in Johnson citing Johnson v. California , 545 U.S. 162, 172, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) instructed that it "did not intend the first step to be so onerous that a defendant would have to persuade the judge-on the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination." 545 U.S. at 170, 125 S.Ct. at 2413.
Williams III , 13-0283, p. 17, 199 So.3d at 1233 ; See also , Duncan , 99-2615, p. 12, 802 So.2d at 544 (quoting State v. Green , 94-0887, p. 28 (La. 5/22/95), 655 So.2d 272, 290, n. 24 ), (where the court explained if an inference cannot be drawn from the evidence presented by the defendant, " 'he is unable to make a prima facie case of purposeful discrimination and his Batson challenge expires at the threshold.' ").
In Williams III , this Court, in reviewing a Batson claim, looked at "relevant numeric and non-numeric evidence." Id. , 13-0283, p. 18, 199 So.3d at 1234 (citing Aspen v. Bissonnette , 480 F.3d 571, 577 (1st Cir. 2007) (footnotes omitted) ). In Aspen, 480 F.3d at 577, the court explained relevant non-numeric and numeric evidence:
In considering Batson claims, courts examine both numeric and non-numeric forms of evidence. Relevant numeric evidence includes the percentage of strikes directed against members of a particular group, e.g. , Paulino [v. Castro ], 371 F.3d [1083] at 1091 [ (9th Cir.2004) ], the percentage of a particular group removed from the venire by the challenged strikes, e.g. , Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), abrogated on other grounds , Tolbert v. Page , 182 F.3d 677, 684 (9th Cir.1999), and a comparison of the percentage of a group's representation in the venire to its representation on the jury, e.g. , United States v. Sangineto-Miranda , 859 F.2d 1501, 1521-22 (6th Cir.1988). Relevant non-numeric evidence includes the striking party's questions and statements during the voir dire, e.g. , Brewer [v. Marshall ], 119 F.3d 993 at 1004 [ (1st Cir. 1997) ], whether the striking party had unused peremptory challenges through which he or she could have eliminated more members of the allegedly targeted group, e.g. , United States v. Allison , 908 F.2d 1531, 1538 (11th Cir.1990), apparent non-discriminatory reasons for striking potential jurors based on their voir dire answers, e.g. , United States v. Stephens , 421 F.3d 503, 515-16 (7th Cir.2005), and whether similarly situated jurors from outside the allegedly targeted group *285 were permitted to serve, Boyd v. Newland , 467 F.3d 1139, 1148-50 (9th Cir.2006).
Non-numeric evidence also includes a comparison of the treatment of prospective jurors of different races and contrasting voir dire questions posed to prospective jurors of different races. Williams III , 13-0283, pp. 22-23, 199 So.3d at 1235-36 (citations omitted.)
Out of the twelve peremptory challenges, the State used ten during the entire voir dire . Additionally, the record is devoid of a Batson challenge during the selection of the second panel of prospective jurors, and there is no objection as to the make-up of the empaneled jury. Further, Dajuan offers no comparison or contrasting treatment of the five African-American jurors who were excused by the State to prospective jurors of another race who were not challenged by the State; Dajuan fails to point out which similarly situated jurors from outside the allegedly targeted group were permitted to serve.
Dajuan limits his Batson challenge to the ground that the removal of the five African-Americans by the State "is the type of systematic exclusion that the Supreme Court intended to protect against in Batson ." The Louisiana Supreme Court has held bare statistics are insufficient to support a prima facie case of discrimination. Duncan , 99-2615, p. 22, 802 So.2d at 550 (citing United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990) ). In Duncan , the defendant argued racial discrimination could be inferred from the record, which showed that the state had struck 84% of the prospective black jurors and only 12% of the prospective white jurors, using five of its eight peremptory challenges to strike black jurors. The Supreme Court held, "there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out." Id. , 99-2615, p. 22, 802 So.2d at 549-50. The court further held it is important for the defendant to come forward with facts, not just numbers alone, when asking the district court to find a prima facie case. Id. (citing Moore, 895 F.2d at 485 ).
The record evidence does not reflect the representation of African-Americans in the venire (panels one and two) as to those on the empaneled jury. Thus, it is impossible to make a valid statistical analysis of the stricken jurors. Dajuan complains the incomplete record-the absence of the district court's strike sheet-makes it impossible for him to prove his claim. However, it was Dajuan's burden to come forward with facts when seeking the district court to find a prima facie showing of discrimination. See Williams III , 13-0283, pp. 20-21, 199 So.3d at 1235 (where this Court found the defendant failed to come forward with facts or context, beyond the bare number of African-Americans the prosecutor struck, to develop a record to support the asserted Batson violation, and concluded it was "impossible to make a valid statistical analysis of the stricken jurors."). Consequently, we find Dajuan's sole ground for making a Batson challenge-the State's use of five of its ten peremptory challenges on African-Americans-was insufficient for the district court to draw an inference of purposeful discrimination. See Id. , 13-0283, p. 24, 199 So.3d at 1237 (where this Court found the defense's sole ground for making a Batson challenge was the state's using one-hundred percent (eleven of the possible twelve) of its peremptory strikes against African-Americans was "insufficient evidence to allow the district court to draw an inference of purposeful discrimination.").
Accordingly, we find the district court did not err in denying Dajuan's Batson *286 challenge, and this assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 13: NON-UNANIMOUS VERDICT
Dajuan asserts the non-unanimous verdict of eleven to one is unconstitutional, in violation of the Fourteenth Amendment. Dajuan states, "Louisiana is only one of two states that allow a non-unanimous jury verdict in felony cases, and the only state where a non-unanimous second degree murder conviction results in mandatory life without parole."
A conviction of second degree murder requires ten of the jurors to concur. Louisiana Constitution Article 1, § 17 (A) provides: "A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict." See also , La. C.Cr.P. art. 782.
In Apodaca v. Oregon , 406 U.S. 404, 406, 92 S.Ct. 1628, 1630, 32 L.Ed.2d 184 (1972), a plurality of the Supreme Court found that the right to unanimity in a jury verdict was not a right "of constitutional stature" sufficient to justify a unanimous jury verdict requirement binding on the state courts. Dajuan urges that since the Apodaca decision "subsequent case law has consistently undermined" the court's reasoning.
Presently in Louisiana, the Apodaca decision is still good law. Recently, in Dove , 15-0783, p. 37, 194 So.3d at 117, the seventeen-year-old defendant was convicted of second degree murder and sentence to life imprisonment without the benefit of parole. On appeal, the defendant asserted his conviction of second degree murder by a less than unanimous jury was unconstitutional. This Court found the error lacked merit:
Our state constitution (Art. I, § 17 ), statutory law ( La.C.Cr.P. art. 782 A), and both federal and state jurisprudence ( Apodaca v. Oregon , 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) ; State v. Bertrand, 08-2215, 08-2311, pp. 6-7 (La. 3/17/09), 6 So.3d 738, 742 ; State v. Curtis, 11-1676, p. 23 (La. App. 4 Cir. 3/13/13), 112 So.3d 323, 335 ) have upheld this procedural device that a less than unanimous jury (ten of twelve jurors) is sufficient to convict a person for second degree murder.
Id.
Accordingly, we find this assignment of error lacks merit.[21]
ASSIGNMENT OF ERROR NUMBER 5: RECUSAL
Dajuan asserts the district court erred by refusing to recuse itself on the ground the district court predetermined a sentence of life imprisonment without the possibility of parole would be imposed. Dajuan points out at the March 31, 2016 hearing, his attorney moved for a continuance of the sentencing hearing. Dajuan alleges that when the district court denied the continuance, the judge stated that regardless of what mitigating evidence the defense presented at sentencing, Dajuan *287 would be sentenced to life without the possibility of parole.[22]
Louisiana Code of Criminal Procedure Article 671 sets forth the grounds for recusal:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
* * *
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
Louisiana Code of Criminal Procedure Article 674 provides, "If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion for hearing to another judge or to a judge ad hoc, as provided in Article 675." In State v. Mims , 97-1500, p. 38 (La. App. 4 Cir. 6/21/00), 769 So.2d 44, 69, this Court explained that a trial judge is presumed to be impartial, and a defendant must prove the claim is of a substantial nature.
In the case sub judice , the district court ruled on the recusal motion itself without referring it to another judge. In denying the motion to recuse, the district court correctly noted the only discretion it had as to sentencing was whether Dajuan would be granted or denied parole eligibility. Additionally, the district court refuted the allegation it had predetermined Dajuan's sentence stating, "No, I have not already made a determination, counsel." Further, the record evidence supports that the district court had not made a predetermination. At the request of the defense, the district court continued the sentencing hearing three times. At the conclusion of the sentencing hearing, the defense requested and the district court granted the defense an opportunity to further investigate and present mitigating evidence on behalf of Dajuan. We find the district court did not abuse its discretion in denying Dajuan's motion to recuse.
This assignment is without merit.
ASSIGNMENTS OF ERROR NOS. 4 AND 14: UNCONSTITUTIONALLY EXCESSIVE SENTENCE
Dajuan claims his sentence of life imprisonment without the possibility of parole is disproportionate, excessive, and unconstitutional.[23] Dajuan asserts the district court erred by imposing his sentence without the benefit of parole; specifically, he notes the district court made no finding of "irreparable corruption." Additionally, Dajuan contends his sentence is excessive because this crime was not the worst of the worst crimes; and he was not the worst of the worst offenders. Dajuan argues that the State's failure to show this was an exceptional case, and that the district court's predetermination of a life sentence without the benefit of parole, before the defense had a chance to present mitigating evidence, makes his sentence unconstitutionally disproportionate.
Applicable law
"The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed." State v. Williams , 15-0866, pp. 12-13 (La. App. 4 Cir. 1/20/16), 186 So.3d 242, 250, writ de nied *288 , 16-0332 (La. 3/31/17), 217 So.3d 358 (citation omitted).
Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive and cruel punishment. State v. Wilson , 14-1267, p. 23 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. A sentence is excessive, even when it is within the applicable statutory range, if it is " 'grossly disproportionate to the seriousness of the offense or imposes needless and purposeless pain and suffering.' " Id. , 14-1267, 165 So.3d at 1166 (quoting State v. Hackett , 13-0178, p. 14 (La. App. 4 Cir. 8/21/13), 122 So.3d 1164, 1174 ). In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice. State v. Wilson , 11-0960, p. 9 (La. App. 4 Cir. 9/5/12), 99 So.3d 1067, 1073. The excessiveness of a sentence is a question of law, and a reviewing court will not set aside a sentence absent a manifest abuse of discretion by the trial court. Wilson , 14-1267, p. 24, 165 So.3d at 1165.
The penalty for second degree murder is life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Because Dajuan was a juvenile at the time he committed the offense, the holding in Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012), is triggered.[24] In Miller , the United States Supreme Court held that mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on " 'cruel and unusual punishments.' " Id. 567 U.S. at 465, 132 S.Ct. 2455. However, Miller did not foreclose denial of parole in all cases. In Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 734, 193 L.Ed.2d 599 (2016) the United States Supreme Court explained that Miller required "a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." The court explained that Miller reiterated that a life sentence without the benefit of parole should be reserved for the rarest of children, those whose crimes reflect " 'irreparable corruption.' " Id. (quoting Miller , 567 U.S. at 480-81, 132 S.Ct. 2455 ). Additionally, in Montgomery , the court held that Miller applied retroactively. Id. 136 S.Ct. at 736.
Following remand from Montgomery , the Louisiana Supreme Court explained that "the Supreme Court ... clarified 'that Miller drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption' and life without parole can only be a proportionate sentence for the latter." State v. Montgomery , 13-1163, pp. 1-2 (La. 6/28/16), 194 So.3d 606, 607.
In response to Miller , the Louisiana Legislature enacted La. C.Cr.P. art. 878.1, which became effective August 1, 2013, which required a hearing to be conducted prior to sentencing to determine whether the sentence shall be imposed with or without parole eligibility. At the time Dajuan was sentenced, Article 878.1 provided:
*289 A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder ( R.S. 14:30 ) or second degree murder ( R.S. 14:30.1 ) where the offender was under the age of eighteen years at the time of the commission of the offense, a hearing shall be conducted prior to sentencing to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).
B. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender's level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases.
Miller hearing
In this case sub judice , a sentencing hearing, pursuant to Miller , was held on March 31, 2016 and completed on June 16, 2016. The State called Ms. Enclade, Ms. Cheryl Bell ("Ms. Bell"), the victim's great aunt, and Blake Arcuri ("Mr. Arcuri"), an employee by the Orleans Parish Sheriff's Office.
Ms. Enclade testified her and her family were devastated when her fifteen-year-old son was murdered. She stated James' death and murder continues to tarnish their lives.[25] Ms. Bell reiterated Ms. Enclade's testimony that the victim's murder had destroyed the family unit.
Mr. Arcuri employed by the Orleans Parish Sheriff's Office as general counsel for litigation and custodian of all jail records, presented aggravating circumstances regarding Dajuan. Mr. Arcuri testified Dajuan was charged with possession of contraband (a cell phone), obscenity (masturbating), and two counts of battery of a correctional officer while incarcerated and awaiting trial in 2015. Mr. Arcuri reported that just a few days prior to trial, Dajuan left his jail cell and struck a deputy with a chair, and this action may result in a charged offense. Mr. Arcuri testified Dajuan was on the highest security classification within the prison system.[26] When asked by the State, "does that mean this inmate has been declared by the sheriff's office to one of the most dangerous inmates in Orleans Parish Prison," Mr. Arcuri responded, "That's correct."
On behalf of Dajuan, the defense called Shewanda Alridge ("Ms. Alridge"), the defendant's mother, and Dr. Daliah Bauer ("Dr. Bauer"), a licensed clinical psychologist and expert in the field of adolescent psychology.
Ms. Alridge testified she was Dajuan's primary caregiver, and Dajuan lived with her, his two siblings, and a niece and a nephew. She stated Dajuan would help her with his niece and nephew. Ms. Alridge testified Dajuan had never been in trouble *290 before his arrest in this case and explained:
Dajuan [sic] never been in trouble in his life until he entered this jailhouse. When he entered this jailhouse, then he became the person he became....
* * *
Dajuan don't come from a broken home. He had two parents that worked hard to give him what he wanted. He's a loving child.
Dajuan's the type of child who'd give you the shirt off his back if you asked him for it, but he became a vicious person when he entered this jail system and it's not all his fault.
Ms. Alridge explained Dajuan's father was still in his life, although they had separated. Also, she stated that Dajuan's step-father was a part of his life. Ms. Alridge reported that Dajuan was diagnosed with schizophrenia and bipolar disorder at the age of five, and he had received medication and therapy for these conditions throughout his life. Ms. Alridge stated when Dajuan was twelve years old, Hurricane Katrina hit and the family lost everything.
Dr. Bauer testified she was familiar with Miller . The defense asked Dr. Bauer to describe the position of the American Psychological Association regarding imposition of sentences of life without parole for juveniles. Dr. Bauer responded:
Essentially, the American Psychological Association states that juveniles are immature, more vulnerable to risk, and more changeable. And for those reasons that juveniles shouldn't be committed to a sentence of life without parole because it doesn't take into account their reduced culpability, and it doesn't take into account the possibility for change in the future.
Dr. Bauer was of the opinion that sixteen and seventeen year-olds who have been incarcerated are capable of learning to change their behavior.
On cross-examination, Dr. Bauer agreed that in order to determine whether a particular sentence would be best for a particular person, it would be important to know and/or to evaluate that person, to know the nature of the crime committed, and to know what that person did in the years following the errant behavior. Dr. Bauer admitted she had not evaluated Dajuan. She stated she did not know his medical history or the specifics of the crime. She indicated she was retained to testify only about "the science of the Miller decision."
During Dr. Bauer's testimony, the district court requested that the doctor be informed of the facts and to give her expert opinion regarding the "science behind the brain development and behavior of adolescents and decision making" as it related to the present case. After being informed of the specifics of the charged crime, Dr. Bauer said that she would not be comfortable rendering an opinion.
Following the hearing, the district court sentenced Dajuan to life imprisonment without the benefit of parole. In setting forth reasons for the sentence imposed, the district court commented the expert called by Dajuan failed to evaluate Dajuan and "unfortunately failed to provide this Court any circumstances that would mitigate as it relates to the sentencing [sic] which the Court is compelled to impose." The district court, found, it was a "very heinous crime" and gave his reasons for imposing the sentence without the benefit of parole:
The court is of the opinion this does not represent the conduct of anyone with an impulsive behavior. Taking into consideration that the fact that [the defendant] was seventeen years and three months, the court does find that the crime was horrific, callous, calculating, *291 and it totally outweighs any evidence presented including any testimony about any abusive or chaotic childhood.
Again the court did not have the opportunity to hear any testimony from the expert as it relates to the evaluation of the defendant. The court is also concerned as we've tried to demonstrate in this community that there is a distinction when it becomes an issue of justice and mercy.
But the fact remains that [the defendant] has demonstrated that he is not capable of continuing to maintain the type of citizenship, the type of conduct, the type of behavior that is expected of anyone in this community. The court is mindful of the fact that based on the sentence the defendant would not be able to receive any parole eligibility or sentence accordingly, and I do find so.
Application of Miller factors
Dajuan stabbed a fifteen year-old boy, who he did not know, forty-nine times and left him to die in an abandoned house. The district court heard testimony of the devastating impact on James' family because of his death.
Dajuan was seventeen-years old and three months at the time he stabbed James. The district court heard testimony from Ms. Alridge regarding Dajuan's childhood and character. Despite hearing testimony that Dajuan had been diagnosed with schizophrenia and bipolar disorder, the district court was of the opinion "this does not represent the conduct of anyone with an impulsive behavior." Further, as to Dajuan's possibility of rehabilitation, there was no testimony for the district court to consider.
We find the record evidence shows the district court diligently considered both the aggravating and mitigating circumstances and found "that the crime was horrific, callous, [and] calculating" in compliance with Article 878.1 and Miller .[27] Additionally, the sentence imposed is not so grossly out of proportion to the seriousness of the offense as to shock our sense of justice. Dajuan's sentence is commensurate to sentences imposed in similar cases with similar-aged defendants.[28] Given this careful review by the district court, we cannot say that the district court abused its discretion by imposing a sentence of life imprisonment without the benefit of parole.
These assignments of error lack merit.
*292 ASSIGNMENT OF ERROR NO 1: INCOMPLETE RECORD
Dajuan complains his right to review on appeal has been compromised by an incomplete trial record. Louisiana Constitution Article I § 19 guarantees a defendant a right of appeal "based upon a complete record of all evidence upon which the judgment is based." Additionally, La. C.Cr.P. art. 843 provides in pertinent part:
In felony cases, ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
It is the duty of the trial court to see that the court reporter makes a true, complete and accurate record; it is not the duty of a defendant to warrant that an adequate record exists. State v. Pernell , 13-0180, p.11 (La. App. 4 Cir. 10/2/13), 127 So.3d 18, 27. In State v. Landry , 97-0499, p. 3 (La. 6/29/99), 751 So.2d 214, 215 (citations omitted), the court explained a defendant has a right to a complete transcript of the trial proceedings, "particularly where counsel on appeal was not counsel at trial."
An incomplete record, however, is not in and of itself a reason for reversal, and an incomplete record may be adequate for full appellate review. See State v. Thomas , 92-1428, 93-2083 (La. App. 4 Cir. 5/26/94), 637 So.2d 1272, 1274. In State v. Jones , 16-0653, pp. 7-8 (La. App. 4 Cir. 5/3/17), 220 So.3d 128, 132-33, this Court set forth the applicable law on reviewing an incomplete record claim:
The Louisiana Supreme Court enunciated a three-part standard for reviewing incomplete record claims. State v. Frank , 99-0553, p. 20-21 (La. 1/17/01), 803 So.2d 1, 19-20. First, "[m]aterial omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal." Id. , 99-0553, p. 20-21, 803 So.2d at 19-20 (citing State v. Robinson , 387 So.2d 1143 (La. 1980) (finding omissions material as substantial portions of the record were missing, including the testimony of four state witnesses, voir dire examination of prospective jurors, and the prosecutor's opening statements) ); See also State v. Diggs , 93-0324 (La. App. 4 Cir. 6/29/95), 657 So.2d 1104 (finding unavailability of witness testimony required a new trial because it could not be determined whether the missing testimony was substantial or inconsequential).
Second, "inconsequential omissions or slight inaccuracies do not require reversal." Frank , 99-0553, p. 21, 803 So.2d at 20 (citing State v. Goodbier , 367 So.2d 356, 357 (La. 1979) (declining to reverse when record did not include voir dire examination transcript and the court reporter's affidavit indicated that no objections were made by the attorneys during voir dire); See also State v. Lyons , 597 So.2d 593 (La. App. 4th Cir. 1992).
Third, "a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. Frank , 99-0553, p. 21, 803 So.2d at 20 (citing State v. Castleberry , 98-1388, p. 29 (La. 4/13/99), 758 So.2d 749, 773 )....
In State v. Pernell , 13-0180, pp. 12-13 (La. App. 4 Cir. 10/2/13), 127 So.3d 18, 28, this Court explained the application of the harmless error rule when reviewing an incomplete record claim:
In determining whether an omission has sufficiently prejudiced a defendant, we consider the importance of the omission along with the value, relevance, and nature of other evidence made available in the trial record in light of the specific assignments of error set forth by the *293 defendant as well as the errors patent on the face of the record. See , e.g. , [State v. ]Hawkins , 96-0766, p. 8, 688 So.2d [473,] at 480 [ (La. 1997) ].
With the applicable law in mind, we turn to Dajuan's specific claims.
Incomplete voir dire transcript
First, Dajuan complains a complete transcript is needed to review the district court's ruling that granted the State's cause challenge for prospective juror number 11, M.J. A review of the voir dire transcript does not reflect there was an omission as to this juror, and Dajuan fails to point out where the omission is in the record. Thus, Dajuan fails to prove a material omission, and we find this claim lacks merit.
Next, Dajuan urges the incomplete voir dire transcript warrants reversal of his conviction. Dajuan complains at least seven times the court reporter indicated "inaudible" as an answer. In support, Dajuan cites Landry , 97-0499, pp. 3-4, 751 So.2d at 216, wherein the Supreme Court reversed the defendant's conviction because portions of the transcript of voir dire , along with other portions of the trial, could not be transcribed, and the record "was littered with '(inaudible).' " However, we find Landry distinguishable. The Landry court was faced with assignments of error relative to the voir dire examination that it could not resolve from the record; whereas, in this case, the assigned errors alleged by Dajuan can be resolved from the present record. We find this claim lacks merit.
Missing transcript of competency hearing of Dennis Lewis
Dajuan complains two transcripts of competency hearings for Dennis are missing from the record. In a separate assigned error, Dajuan challenges Dennis' competency to testify at trial. The transcripts, in which Dajuan complains are missing, are not needed to adequately review Dajuan's claim that Dennis was incompetent to testify; the alleged error was fully reviewed supra , and we find it lacks merit. Consequently, Dajuan fails to prove how these two transcripts are material, and he fails to show omission of the transcripts affected his substantive right to appellate review. We find this claim lacks merit.
Missing bench conferences
Dajuan protests that multiple bench conferences are missing:
Multiple bench conferences are apparent from the record, none of which have been transcribed, despite this Court's order that they be supplemented to the record. The court reporter certified that "bench conferences held are not available."... At least one of these conferences contained an objection, presumably argument, and a ruling....(court notes a defense objection upon the conclusion of the bench conference during Dennis's testimony).
In State v. Hoffman , 98-3118, pp. 50-51 (La. 4/11/00), 768 So.2d 542, 586-87 (footnote omitted), the Supreme Court set forth the general rule on recordation of bench conferences:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. State v. Clark , 93-0903 (La. App. 3d Cir. 1994), 638 So.2d 225, 227 ; State v. Richardson , 529 So.2d 1301, 1308 (La. App. 3d Cir.1988). Similarly, Art. I. § 19's command to record "evidence" does not encompass bench conferences, at least, not ones *294 that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.
The Hoffman court looked at the record to determine if the unrecorded bench conferences had a discernible impact on the proceedings and what specific prejudice did the defendant allege as a result of the unrecorded conference. Id. , 98-3118, p. 51, 768 So.2d at 587.
In the case sub judice , the specific unrecorded bench conference in which Dajuan complains occurred during the State's questioning of Dennis:
[The State]:
Q. Well, I think there's a lot of things my friends probably wouldn't do to me. One of them being, stabbing me 49 times, but we will get that. Let me ask you. You're walking in the street-
[The Defense]: Judge, permission to approach?
THE COURT: Yes, you may. (Counsel approaches the Bench. Bench Conference ensues and concludes.)
THE COURT: I note your objection for the record. Please continue, counsel.
[The State]:
Q. So, you see him in the street and you tell him-you said, he just starts following you.
[Dennis]: Yeah, I said, come on.
The defense failed to set forth on the record any objection to what occurred before or during the bench conference and the contents of the discussion. The record evidence does not indicate that Dajuan was prevented from presenting any relevant evidence and that the failure to record this bench conference had a discernible impact on the proceedings. Further, Dajuan fails to allege or prove any specific prejudice suffered by him. Consequently, Dajuan fails to prove how this alleged omission is material and to show it affects his substantive right to appellate review. We find this claim lacks merit.
Transcript of hearing on motion to recuse the district court judge
Dajuan complains that despite this Court's order for a transcript of the July 15, 2016 proceeding, that included the "interaction between defense and the trial court regarding the motion to recuse....," the court reporter responded it was unavailable. However, this transcript is not needed to adequately review Dajuan's assigned error wherein he asserts the district court erred in failing to grant his motion to recuse. As a result, Dajuan fails to prove how this alleged omission is material and fails to show it affects his substantive right to appellate review. We find this claim lacks merit.
Cumulative omission
Dajuan alleges omissions in the transcript deprive him of at least eight substantial claims on appeal. As discussed above, the record before this court is sufficient to address each of Dajuan's assigned errors.
Accordingly, we find this assignment of error lacks merit.
PAGE LIMITATION OF BRIEF
Dajuan complains application of a state court rule pertaining to brief page limitation violates his right to a full and fair appeal. He explains this Court's action in limiting his brief to forty-one pages restricted his right to raise the following claims:
(1) The State repeatedly shifted its own burden of proof to the defense, (2) the State improperly and repeatedly commented on the defense's ethical duties (3) the State committed a material Brady violation by not disclosing Dennis Lewis' juvenile adjudications (4) the State's rebuttal included several improper arguments and an improper expert opinion not in evidence (5) a litany of hearsay statements violated [the defendant's *295 ] right to cross-examination under the confrontation clause (6) the court erred in allowing the coroner to speculate about the position of the victim during the crime (7) the trial court erred in allowing the State to play several irrelevant and prejudicial phone calls (8) the trial court's exclusion of the jury instruction regarding "identification" was error (9) [the defendant's] sentencing by a court violated his constitutional right to be sentenced by a jury of his peers (1) the trial court violated [the defendant's] rights by allowing the victim's mother to testify about the appropriate sentence in this case.
Uniform Rules, Louisiana Courts of Appeal, Rule 2-12.2(D)(3) provides that a request for leave to file a brief in excess of the page limitation may be granted for "extraordinary and compelling circumstances." Dajuan fails to present extraordinary and compelling reasons justifying a brief lengthier than the forty-one pages. Further, in addition to the original brief, Dajuan, through his counsel, filed a reply brief and supplemental brief.
We find this assertion lacks merit.
DEFENDANT'S MOTION FOR NEW TRIAL
Dajuan filed in the appellate court a "Motion for New Trial, Or In The Alternative To Remand To Determine If The Trial Record Can Be Completed." The defendant argues that the incomplete voir dire transcript, the absence of the competency hearings of Dennis Lewis, and the non-inclusion of transcripts of bench conferences, pretrial and status conferences and discovery hearings denies him of his constitutional right to a complete record on appeal. First, the voir dire transcript was completed; thus, the issue regarding the incomplete voir dire is moot. Secondly, there is no procedural vehicle to seek a motion for new trial in the appellate court. Finally, the record afforded Dajuan an adequate review on appeal, and Dajuan fails to prove how these alleged omissions are material and affect his substantive right to appellate review.
Accordingly, Dajuan's motion is denied.
CONCLUSION
Dajuan's conviction and sentence are affirmed. Further, Dajuan's Motion for New Trial is denied.
AFFIRMED
LOVE, J., CONCURS IN THE RESULT AND ASSIGNS REASONS
LOVE, J., CONCURS IN THE RESULT AND ASSIGNS REASONS
I respectfully concur in the result. I write separately to emphasize the facts that substantiate this young man's life sentence. Based on the record, I find sufficient evidence to support Mr. Alridge's conviction and sentence. While there is no forensic evidence linking Mr. Alridge to the murder, there is sufficient circumstantial evidence, including the confession supplied by Dennis Lewis, from which the jury could conclude that Mr. Alridge intended to kill the victim. Additionally, appellate courts have previously deemed a life sentence without parole was not excessive in cases in which the defendants were of the same age and younger than Mr. Alridge. See State v. Smoot , 13-453 (La. App. 5 Cir. 1/15/14), 134 So.3d 1 ; State v. Brooks , 49,033 (La. App. 2 Cir. 5/7/14), 139 So.3d 571 ; State v. Fletcher , 49,303 (La. App. 2 Cir. 10/1/14), 149 So.3d 934.
Mr. Lewis recounted that he and Mr. Alridge lured the victim to a vacant neighborhood house with the promise of drugs. Mr. Lewis confessed he restrained the victim by his arms, while Mr. Alridge stabbed the victim forty-nine times. Dr. Huber's testimony explained that the victim's injuries, primarily to the front of his body, were consistent with being restrained by one person and stabbed by another, thus *296 debunking Mr. Lewis' contention that he acted alone in murder. As the victim bled to death in the house, Mr. Lewis encased the victim's head and face in plastic tape and placed a plastic sheet over the body. Mr. Lewis and Mr. Alridge then went to Mr. Lewis' house to destroy the evidence by burning their clothes and shoes, which included three socks, two of which were a pair. Mr. Alridge had to borrow some of Mr. Lewis' clothes and a pair of Mr. Lewis' sister's tennis shoes in order to return to his own residence. Smoke from the clothes burning aroused the suspicion of a neighbor, who confronted Mr. Lewis about what was going on and reported the activity of the police.
The circumstantial evidence supported Mr. Lewis' statement. K.S., the victim's youngest brother, testified at trial that the victim left their house on November 30, 2009, with "Dennis" and a "person with dreads." The forensic interviewer at the Child Advocacy Center, who interviewed K.S. the day the victim's body was discovered, confirmed that K.S. identified pictures of Mr. Lewis and Mr. Alridge as the people he last saw with the victim. Additionally, Detective Duzac testified that neighbors reported to the police having observed three males enter the abandoned house in which the victim's body was eventually found. When Detective Duzac examined the murder scene, the body was clothed, covered in plastic wrap and stabbed multiple times, just as Mr. Lewis confessed to Detective Matthews. Further, Mr. Lewis' confession was corroborated by Detective Duzac's testimony that when Mr. Alridge was arrested, he was wearing the girl's white tennis shoes with colored laces Mr. Lewis said he gave Mr. Alridge after burning the clothes and shoes they had worn when they murdered the victim.
Considering both the brutal nature and extent of injuries inflicted upon the victim-forty-nine stab wounds, and viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Alridge specifically intended to kill the victim.
Likewise, I find Mr. Alridge's life sentence without the possibility of parole is neither disproportionate nor excessive and unconstitutional. A trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Williams , 15-0866, p. 12-13 (La. App. 4 Cir. 1/20/16), 186 So.3d 242, 250 (citing State v. Fountain , 07-1004, p. 5 (La. App. 4 Cir. 1/23/08), 976 So.2d 763, 766 ). Mr. Alridge's conviction for second degree murder mandated a life sentence. The only determination the trial court was called upon to make was whether Mr. Alridge would be granted or denied parole eligibility. At the Miller hearing[1] , the victim's family testified to the devastating impact of the victim's murder on the family. The State also offered the testimony of Blake Acuri of the Orleans Parish Sheriff's Office, who recounted several prison incidents involving Mr. Alridge while he was incarcerated awaiting trial. As a result of these incidents, Mr. Alridge was identified within the prison system as one of the most dangerous inmates, requiring his being confined to his cell for twenty-three hours a day and allowed, for one hour, out of his cell, though his hands and legs had to be restrained.
While Mr. Alridge's mother testified that Mr. Alridge was diagnosed with schizophrenia and bipolar disorder at age *297 five and had received medication and therapy for both, no medical evidence of any mitigating facts were presented. Nevertheless, the trial court held the matter open to allow defense an opportunity to further investigate and present mitigation evidence. The defense offered the testimony of Dr. Bauer in mitigation; however, her testimony was limited to "the science of the Miller decision." Dr. Bauer admitted that she had not evaluated Mr. Alridge, knew nothing of his medical history, and testified that she was not comfortable rendering an opinion regarding Mr. Alridge's ability to change.
In light of these facts and jurisprudence, in which a life sentence without parole was deemed not excessive in cases of defendants of the same age and younger than Mr. Alridge, I find the sentence of life imprisonment without parole does not constitute excessive punishment. For these reasons, I concur in the result reached by the majority.

On February 9, 2015, the State severed Dajuan's and Dennis' cases. The State amended the indictment to charge Dennis with manslaughter on April 24, 2015; and, on that same date, Dennis pled guilty to manslaughter and was sentenced to forty years at hard labor.

Following imposition of sentence, Dajuan filed a motion for reconsideration of sentence that was denied.

Initials were used at times throughout the opinion to protect the privacy of the individuals involved.

Detective Matthews did not testify at trial.

The December 5, 2009, statements were transcribed, and a transcript of the statements were published to the jury.

Dennis stated he burned James' pants, jacket, and tennis shoes and left James' body in green shorts and a "t-top."

The prints are from a person or persons wearing shoes.

Throughout the trial, these shoes were also described as tennis shoes with rainbow laces.

Because of K.S.'s young age, a competency hearing was conducted, and the district court found K.S. competent to testify.

He explained as an interviewer he was trained to ask a child open-ended questions to obtain a narrative of an event, rather than posing questions which require a yes or no response. He stated that the child is interviewed alone, without the presence of parent(s), siblings or the police, and the interview is videoed and audio-recorded.

In Scott , 15-0778, pp. 9-10, 197 So.3d at 304-05 (footnote omitted), this Court explained:
[T]o prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes. State v. White , 14-0397, p. 17 (La. App. 4 Cir. 7/29/15), 174 So.3d 177, 189. "In addition to proving the statutory elements of the charged offense at trial, the state is required to prove a defendant's identity as the perpetrator." State v. Page , 08-531, p. 6 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 447.

Dajuan challenges K.S.'s testimony on the grounds K.S. was five years old when he identified Dajuan as one of the perpetrators, and the identification was made two weeks after James disappeared. In the alternative, Dajuan argues even if K.S. correctly identified him as being with Dennis on the day James was murdered, it only meant he was with James at some point on November 30, 2009. He asserts that "[s]ince there is no scientific way to know when the victim was killed, and no witnesses testified that Dajuan was at the scene of the killing, K.S.'s identification does not support the charge of second degree murder."

Dajuan challenges the footprints found at the scene asserting:
First, the comparative sizes of these shoeprints was testified to by Det. Duzac, who was not qualified as an expert; as such, he was not adequately equipped to determine whether this shoeprint was measured properly or whether it was a full print. Further, the victim's feet were never measured and he was found in socks-Dennis testified that he burned the victim's shoes in his backyard.... Thus, the single "smaller" print could have belonged to the victim. Finally, even if there were two shoeprints left by two perpetrators, this print was not consistent with any shoes associated with Dajuan-he was arrested in shoes whose prints did not match the distinct pattern of the shoeprint, and the police did not find any shoes at his home that matched the prints left at the scene.... There was no testimony that Dajuan's shoe size was even consistent with the alleged second print.

Dajuan asserts the jailhouse calls were "mainly irrelevant." However, he fails to specify which call he is referring to and how it was irrelevant.

The case arose three years before the United States Supreme Court decided Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In his brief to this court, Dajuan suggests that "[u]ltimately, K.S. chose the picture that had been on the news and in the newspaper for days." However, Dajuan fails to assert the possibility of K.S. seeing his picture on the news as a basis to find that the identification was suggestive. Additionally, the defense failed to question K.S. at trial on whether he saw Dajuan's picture on the news before the identification was made, and if so, what impact if any, it had on his identification.

Louisiana Code of Criminal Procedure Article 795 codifies Batson.

In Williams II , the Supreme Court granted Mr. Williams' petition for a writ of certiorari, vacated this Court's judgment in State v. Williams ( "Williams I ") , 13-0283 (La. App. 4 Cir. 4/23/14), 137 So.3d 832, and remanded the case, State v. Williams ("Williams III") , 13-0283 (La. App. 4 Cir. 9/7/16), 199 So.3d 1222, to this Court for further consideration in light of Foster v. Chatman , 578 U.S. ----, 136 S.Ct. 1737, 195 L.Ed.2d 1 (2016).

The race of the prospective jurors, except those who were challenged by the defense under Batson , is not indicated in the record before this Court.

Dajuan also asserts that "[f]or preservation purposes, appellant also raises a claim that the racial origins of the non-unanimous jury provision deprives Dajuan of his rights under the 14th Amendment." However, Dajuan fails to allege any facts or law in support of this assertion. "The court may consider as abandoned any assignment of error or issue for review which has not been briefed." Rule 2-12.4(B)(4). Accordingly, we deem the issue abandoned. See State v. Gaines , 347 So.2d 1153, 1155 (La. 1977) ; Maldonado-Mejia v. Eversound Kitchen & Bath, LLC , 15-0859 (La. App. 4 Cir. 4/20/16), 194 So.3d 1136, 1139, writ denied , 16-0963 (La. 9/6/16), 205 So.3d 914.

This ground was alleged in the Motion to Recuse.

In Dajuan's motion to reconsider sentence he alleged his sentence was unconstitutionally excessive under the state and federal constitution.

Although Dajuan committed the offense before Miller was decided and La. C.Cr.P. art. 878.1 was enacted, Miller and art. 878.1 are applicable. See State v. Graham, 14-1769 (La. App. 1 Cir. 4/24/15), 171 So.3d 272, 278, (quoting State v. Jones, 13-2039 (La. 2/28/14), 134 So.3d 1164 (unpub.) ) where the supreme court stated, "Defendant is entitled to the benefit of the decision in Miller v. Alabama , 567 U.S. [460], 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), because his case was in the direct review pipeline when Miller was decided."

Ms. Enclade related how she still cried over his death, and every time she closed her eyes she saw the victim begging for his life; and she suffered unbearable pain because she was unable to help her child.

This classification included the prisoner being locked down for twenty-three hours a day, and, for one hour the prisoner was allowed out of his cell, but, the prisoner's hands and legs were restrained. The classification also required that the prisoner be supervised and transported by one of the emergency response teams.

Dajuan erroneously contends the State had the burden of proof. As set forth in subpart (B) of Article 878.1, the state and the defendant can introduce aggravating and mitigating circumstances for a trial court to utilize in deciding whether the life imprisonment sentence should be imposed with or with parole.

Another consideration that lends guidance is a comparison of Dajuan's punishment with the sentences imposed for similar crimes by the same court and other courts. State v. Walker , 542 So.2d 756, 760 (La. App. 4 1989) (citing State v. Telsee, 425 So.2d 1251, 1254 (La. 1983). In State v. Smoot , 13-453 (La. App. 5 Cir. 1/15/14), 134 So.3d 1, in affirming the seventeen-year-old defendant's sentence of life imprisonment without the benefit of parole, the appellate court noted the trial court, considered, the defendant's youth and previous criminal activity; and it took into account that the victim, an elderly homeless HIV-positive crack addict, was shot multiple times in the front and back by the defendant. In State v. Brooks , 49,033 (La. App. 2 Cir. 5/7/14), 139 So.3d 571, the seventeen-year-old defendant participated in a gunfight, which resulted in the death of an innocent fifteen-year-old bystander. His sentence of life imprisonment without the benefit of parole was affirmed. In State v. Wilson , 14-1267 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, this Court, in affirming the sentence of life imprisonment without the benefit of parole, noted the brutality of the crime-the victim was forced out of his vehicle and shot multiple times.

See Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) ; and La. C.Cr.P. art. 878.1.